UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA,**

                                                  **Hon. Hugh B. Scott**

                                                  **08CR185A**

                    v.                                 **Report**
                                                        **&**
                                               **Recommendation**

**James D. Stewart,**
                      **Defendant.**

Before the Court is the defendant's omnibus motion seeking various relief including the suppression of evidence and statements (Docket No. 31).[1]

**Discussion**

On July 24, 2008, the Grand Jury for the Western District of New York indicted the defendant, James D. Stewart ("Stewart") on nine counts of wire fraud in connection with the purported sale of laptop computers in violation of 18 U.S.C. §1343. (Docket No. 1). The government alleges that Stewart represented that he would sell 2,409 computers to an individual and induced that individual to wire-transfer $162,875 to the defendant, but did not provide any of the computers to the victim.

---

[1] The defendant's various requests for discovery are discussed in a separate Decision & Order.

On July 28, 2008, Stewart, a Canadian citizen, was stopped at the Rainbow Bridge attempting to enter the United States. He was traveling with his girlfriend, Kelly Frigault ("Frigault") and their infant son, Cole. During the primary inspection at the bridge, Customs and Border Protection ("CBP") Officer Michael Mercer ("Mercer") discovered a federal arrest warrant for Stewart. (Docket No. 41 at 49-50). CBP Officer Eric Frischlag ("Freischlag") escorted Stewart to the secondary inspection station. (Docket No. 41 at page 49). Stewart was placed in a holding cell. (Docket No. 41 at 52). According to Freischlag, although Stewart was patted down for weapons and contraband, he was not interviewed by any CBP officers. (Docket No. 41 at 52). Freischlag confirmed that Stewart was the subject of a warrant and called Federal Bureau of Investigation ("FBI") Agent Joseph Ondercin ("Ondercin"). At some point, prior to the arrival of Ondercin and FBI Agent John R. Manes ("Manes"), Stewart was escorted upstairs to be processed to be paroled into the United States for potential court proceedings. (Docket No. 41 at 54). An inspection of the vehicle Stewart was driving was performed. According to Freischalg, because there were no inadmissibility issues relating to Frigault or the infant, once the vehicle inspection was performed Frigault and her son were free to leave at their leisure. (Docket No. 41 at 56).

Ondercin testified that he received a call from Freischalg at approximately 6:30 p.m. informing him that Stewart had been detained at the Rainbow Bridge. (Docket No. 41 at 6, 7). Ondercin stated that Freischlag informed Ondercin that Stewart was traveling with his girlfriend and a child, and asked Ondercin if he needed to speak to them; Ondercin replied: "no" and that as far as he was concerned they could go. (Docket No. 41 at 6-7). Ondercin stated that he arrived at the Rainbow Bridge at approximately 8:00 p.m. and that he did not see Frigault or the child that

2

evening. (Docket No. 41 at 7). Ondercin identified himself to Stewart as a FBI agent, advised Stewart that he was under arrest and advised Stewart of his rights by reading them from an advice of rights form. (Docket No. 41 at 8). According to Ondercin, Stewart understood his rights and agreed to talk to the Agents, but refused to sign the form. Ondercin made a notation on the form to the effect that Stewart "verbally accepted and willing to talk to Agent, refused to sign form." (Docket No. 41 at 8-11; see also Government's Exhibit 1). Ondercin stated that the interview with Stewart lasted approximately "an hour and a half"; that he did not recall if Stewart was in handcuffs, but that Stewart did not complain that he was uncomfortable; that Stewart never asked to stop the interview; that he offered to get Stewart food and drink; that he allowed Stewart to use the restroom. (Docket No. 41 at 14-15). At the end of the interview, he allowed Stewart to make a phone call, which Stewart used to call Frigault (Docket No. 41 at 25). Manes' testimony is consistent with that of Ondercin. Manes testified that he was not aware that Frigault's girlfriend and child were present at the Rainbow Bridge. (Docket No. 41 at 31). Manes witnessed Ondercin read Stewart his rights and confirmed that Stewart agreed to talk to the agents but refused to sign anything. (Docket No. 41 at 33). CBP Officer Jefferey Aranyosi ("Aranyosi") testified that he fingerprinted and processed Stewart to prepare the I-213 form relating to deportable or inadmissible aliens. (Docket No. 41 at 84). Aranyosi stated that he did not interview Stewart. Further, Aranyosi testified that he was not aware that Stewart was with anyone at the Bridge when he was stopped. (Docket No. 41 at 82).

      The defendant, Stewart, testified at the suppression hearing on March 4, 2010. He stated that he, Frigault and their son were attempting to cross into the United States to have dinner in Niagara Falls, New York. (Docket No. 41 at 99). He argues that he felt pressured into speaking

with the FBI because he was under the impression that Frigault and Cole were being detained. He claims that he was told by an officer that if he cooperated with the FBI, Frigault and Cole would be allowed to leave. (Docket No. 41 at 105). The defendant cannot identify the officer who allegedly made this statement to him. He states that it was not Ondercin, Manes, or Anranyosi, but is not sure if the statement was made by Freischlag (Docket No. 41 at 122). Freischlag, Ondercin, Manes and Aranyosi each denied that they advised Stewart that Frigault and the child would be let go if Stewart agreed to speak with the FBI or make a statement. (Docket No. 41 at 11 (Ondercin); 34 (Manes); 55 (Freischlag); 82 (Aranyosi)). Aside from the vague representations in this regard by Stewart, there is no evidence that anyone pressured Stewart into speaking with the FBI by intimating that Frigault and Cole were being detained until he cooperated. According to the testimony of Freischlag and Aranyosi, individuals traveling with a person who is detained due to an existing warrant are allowed to leave as soon as it is determined that there are no admissibility issues relating to them and the vehicle they are traveling in is inspected. (Docket No. 41 at 48; 79-80). According to Freischlag, such individuals are told they can wait in the lobby or they can leave. (Docket No. 41 at 49, 80). Indeed, Stewart acknowledges that Frigault advised him that she went to the lobby of the building as he was taken into custody. (Docket No. 41 at 100). Stewart acknowledges that Ondercin read him his rights (Docket No. 41 at 112) but that he refused to sign the form (Docket No. 41 at 112-113). Stewart also admits that he understood the rights as read to him from the form. (Docket No. 41 at 113) and that no one yelled at him; they let him use the restroom and allowed him to make a telephone call. (Docket No. 41 at 114). Frigault testified that after Stewart was taken into custody, "they took me and Cole and made us walk to another side of the building" (Docket No. 41 at 129) and asked her to

4

have a seat. (Docket No. 41 at 130). She acknowledges that she was taken to the lobby of the building and that she was not placed in a detention cell (Docket No. 41 at 135). Frigault stated that at the time she was asked to have a seat in the lobby, she did not feel that she was free to go. (Docket No. 41 at 130). This is consistent with the testimony of Freischlag and Aranyosi to the effect that individuals traveling with a person being detained due to a warrant would be free to leave after it was determined that there were no admissibility issues relating to them and the vehicle they were traveling in was inspected. (Docket No. 41 at 48; 79-80). Frigault acknowledged that she did not hear any officer tell Stewart that if he agreed to talk to the FBI, she and her son would be let go. (Docket No. 41 at 136). The evidence in the record does not suggest that Frigualt and Cole were still at the Bridge at the time the FBI agents arrived to interview Stewart.

The defendant seeks to suppress statements he made to Ondercin and Manes during the July 28, 2008 interview on the grounds that they were made under duress due to his concern for his girlfriend and child.

**Discussion**

Based upon the defendant's own testimony, it is undisputed that Stewart was read his rights prior to being interviewed by the FBI, that he understood those rights. To establish that a defendant validly waived his Miranda rights, the government must prove by a preponderance of the evidence "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving the right." United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995). The existence of a Miranda

5

waiver does not prevent a court from finding that a confession was involuntary and must be suppressed. See Dickerson v. United States, 530 U.S. 428, 434 (2000). "A confession is not [voluntary] when brought about by circumstances that caused the [suspect's] will to be overborne at the time he confessed." Green v. Scully, 850 F.2d 894, 900 (2d Cir.1988). To determine voluntariness, the reviewing court must apply a totality of the circumstances test to see if the confession was truly the result of "free and unconstrained choice." Id. at 900-01 (internal citations and quotations omitted). In applying that test, the court must consider three broad categories of circumstances: "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." Id. at 901-02. More specifically, courts commonly look at factors such as: the suspect's experience, education, and background; the conditions under which the suspect was questioned, including the location and length of detention and the presence or absence of counsel; the nature of the questioning; whether the suspect was informed of his constitutional rights; whether there was physical mistreatment or deprivation; and the use of "psychologically coercive techniques." Id. at 902.

Based upon the record in this case, considering all the facts and circumstances surrounding the interview of Stewart on July 28, 2008, the Court cannot conclude that the statements he made were the product of coercive techniques or duress. There is no credible evidence that Frigault and her child were detained any longer than to determine whether any admissibility issues applied to them and to allow for the inspection of the vehicle driven by Stewart. There is no credible evidence that anyone advised Stewart that Frigualt and Cole were being detained or that they would be released if Stewart cooperated with the FBI. To the contrary, the credible evidence in the record in this case reflects that Frigault was asked to wait in

6

the lobby of the inspection station while an inspection of the vehicle was performed. After it was determined that there were no admissibility issues as to Frigault or her child, she was allowed to leave. Frigault states that she waited at the bridge between one and two hours before leaving. She was never placed in a detention cell. She did not hear anyone advise Stewart that she could not leave unless he cooperated with the FBI. The record reflects that Frigualt was free to leave *before* Ondercin and Manes even arrived at the bridge to conduct the interview with Stewart. The Court also finds credible the testimony of Ondercin, Manes, Freischlag and Aranyosi to the effect that no such statement was made to Stewart.

The motion to suppress any statements made by Stewart on July 28, 2008 should be denied.

## Conclusion

Based on the above, the it is recommended that the defendant's motion to suppress his statements made on July 28, 2008 be denied.

Pursuant to 28 USC §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as WDNY Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO**

**FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and WDNY Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to WDNY Local Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3)may result in the District Court's refusal to consider the objection.**

So Ordered.

                                                */s/ Hugh B. Scott*
                                            United States Magistrate Judge
                                              Western District of New York

Buffalo, New York
September 17, 2010